IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JAMES HERMAN RAYNOR,      )
      )
      Plaintiff,      )
      )
v.      )      Civil Action No. 1:13cv1117 (LMB/JFA)
      )
G. PUGH,      )
      )
      Defendant.      )
_____)

## MEMORANDUM OPINION AND ORDER

This matter is before the court on plaintiff's Motion for Sanctions Due to Spoliation of

Evidence. (Docket no. 96). In this motion, plaintiff requests that the court issue an adverse jury

instruction, enter a default judgment, or order other sanctions deemed appropriate to remedy

defendant's alleged spoliation of surveillance video of the events before, during, and after

plaintiff was attacked and injured by another inmate. Having reviewed the pleadings initially

filed by the parties, heard oral argument, and reviewed the various supplemental materials filed

following oral argument, the court finds the matter ripe for adjudication and dispenses with

additional oral argument. For the reasons that follow, the court grants in part and denies in part

plaintiff's Motion for Sanctions Due to Spoliation of Evidence.

### Procedural Background

The complaint in this action was filed on September 4, 2013 against defendants G. Pugh

("Pugh"), Harold W. Clarke ("Clarke"), and Marie Vargo ("Vargo"). (Docket no. 1) ("Compl.").

On November 15, 2013, the District Judge granted plaintiff's motion to amend (Docket no. 6) his

complaint. (Docket no. 10). On January 10, 2014, the District Judge dismissed plaintiff's claims

1

as to defendants Clarke and Vargo pursuant to 28 U.S.C. § 1915(A) for failure to state a claim

and ordered that defendants Clarke and Vargo be dismissed without prejudice. (Docket no. 14).

The District Judge also ordered that defendant Pugh file an answer or other responsive pleading

to the complaint. (*Id.*). On February 7, 2014, counsel for Pugh made an appearance in this

matter (Docket no. 18), and on March 13, 2014, Pugh filed an answer to the complaint (Docket

no. 20), a motion for summary judgment (Docket no. 21), a memorandum in support (Docket no.

22), and a notice in accordance with *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975) (Docket

no. 23). Plaintiff, proceeding *pro se*, filed a response to Pugh's motion for summary judgment

on March 31, 2014. (Docket no. 36). On November 7, 2014, finding no genuine issue of

material fact, the District Judge granted Pugh's motion for summary judgment. (Docket no. 54).

Plaintiff timely appealed the dismissal on November 25, 2014. (Docket no. 56). On March 17,

2016, the Fourth Circuit Court of Appeals vacated the judgment of the District Judge and

remanded the case for further proceedings. *Raynor v. Pugh*, 817 F.3d 123 (4th Cir. 2016);

(Docket no. 62).

On May 19, 2016, now represented by counsel, plaintiff filed an amended complaint

against defendant Pugh. (Docket no. 76) ("Am. Compl."). Plaintiff's amended complaint brings

one count under 42 U.S.C. § 1983 against Pugh for failure to protect and intervene in violation of

the Eighth Amendment to the United States Constitution. (Am. Compl. ¶¶ 92–107). A

Scheduling Order was entered by the District Judge on June 17, 2016, which provided that

discovery in this matter was to close on September 9, 2016. (Docket no. 88). On July 15, 2016,

plaintiff filed this motion, a memorandum in support (Docket no. 97), and a notice setting a

hearing on the motion for July 22, 2016 (Docket no. 98). On July 18, 2016, the undersigned

entered an order continuing the hearing on this motion to July 29, 2016, and ordered that any

opposition to this motion be filed by July 22, 2016, and any reply thereto must be filed by July 26, 2016. (Docket no. 103). On July 22, 2016, defendant filed a memorandum in opposition (Docket no. 106) and an affidavit from Roger D. Hayes ("Lieutenant Hayes"), a corrections lieutenant and the institutional investigator at Sussex II State Prison ("Sussex II"), in support of defendant's opposition (Docket no. 106-1) ("Hayes Aff."). On July 26, 2016, plaintiff filed his reply to defendant's memorandum in opposition. (Docket no. 109; *see also* Docket no. 111).[1] On July 27, 2016, the parties filed a joint motion requesting a continuance of the July 29, 2016 hearing on this motion to August 12, 2016 (Docket no. 113), which the court granted on July 28, 2016 (Docket no. 115).

On August 9, 2016, plaintiff filed a Supplement to Reply to Motion for Sanctions Due to Spoliation of Evidence and exhibits in support. (Docket no. 118) ("supplemental reply"). On August 11, 2016, the defendant filed an Objection and Motion to Strike (Docket no. 122) ("motion to strike"), which requested the court strike the plaintiff's supplemental reply and exhibits submitted in support. Thereafter, plaintiff filed a Motion for Leave of Court to File ECF No. 118 and Memorandum in Support Thereof and Opposition to Objection and Motion to Strike (ECF No. 122) (Docket no. 126) ("motion for leave"), requesting the court find good cause for plaintiff's supplemental reply.

On August 12, 2016, counsel for the parties appeared before the court to present argument on this motion. (Docket no. 127). The court denied defendant's motion to strike and granted plaintiff's motion for leave. (Docket no. 131). The court further directed defendant to file a response to plaintiff's supplemental reply that addressed the applicability, if any, of the

---

[1] Plaintiff's initial motion requested that sanctions be imposed and that the court "issue an adverse inference instruction." (Docket no. 96). The reply ups the ante and requests that a default judgment be granted as a sanction or, at the very least, a mandatory adverse inference instruction be given. (Docket nos. 109, 111 at 12–14).

legislative authority submitted by the plaintiff in his supplemental reply. (*Id.*). The court took

this motion under advisement and directed the parties to arrange to provide the court with the

complete deposition transcript of Lieutenant Hayes and submit short analyses of how Lieutenant

Hayes's testimony affects the issues presented in this motion. (Docket no. 129). The court also

indicated that upon submission of the defendant's response to plaintiff's supplemental reply, the

deposition testimony of Lieutenant Hayes, and the parties' analyses of Lieutenant Hayes's

deposition testimony, the court would decide this motion on the papers or schedule additional

oral argument if necessary. (*Id.*). On August 17, 2016, defendant filed his response to plaintiff's

supplemental reply addressing the legislative authority submitted by plaintiff. (Docket no. 132).

On August 19, 2016, the plaintiff submitted the complete transcript of Lieutenant Hayes's

deposition and the accompanying exhibits (Docket nos. 136, 136-1 ("Hayes Dep."), 136-2, 136-

3, 136-4, 136-5, 136-6). As agreed by the parties, the plaintiff and defendant submitted their

analyses of how Lieutenant Hayes's testimony affects the issues presented in this motion on

August 26, 2016. (Docket nos. 142, 143).

On August 31, 2016, plaintiff filed a Motion for Court to Take Notice of the Deposition

of Matthew Savino and for Leave to File the Same and an incorporated memorandum in support.

(Docket no. 148) ("second motion for leave"). That motion requested leave to file the deposition

transcript of Matthew Savino ("Mr. Savino") (Docket no. 148-1) ("Savino Dep."), the electronic

security manager at the Virginia Department of Corrections ("VDOC"), in support of this motion

and requested the opportunity to submit short analyses of how Mr. Savino's deposition testimony

bears on this motion. (Docket no. 148). Defendant consented to the relief requested in the

second motion for leave. (*Id.* at 4). On September 1, 2016, the court granted plaintiff's second

motion for leave and ordered that the parties submit short memoranda addressing Mr. Savino's

deposition testimony by September 6, 2016. (Docket no. 151). On September 6, 2016, the plaintiff filed his memorandum addressing Mr. Savino's deposition testimony (Docket no. 158) and exhibits in support (Docket no. 158-1, 158-2, 158-3), and defendant filed his memorandum (Docket no. 157) and an exhibit containing a portion of defendant Pugh's deposition transcript (Docket no. 157-1) ("Pugh Dep.").

On September 12, 2016, plaintiff filed a Motion for Court to Take Notice of Defendant's Responses to Plaintiff's Second Set of Interrogatories and for Leave to File the Same. (Docket no. 160). No response or opposition was filed by the defendant to that motion and the motion was granted by an order entered on September 26, 2016. (Docket no. 176).

## Factual Background

### A.    The Assault of Plaintiff

The following facts are alleged in the amended complaint filed on May 19, 2016.[2] Plaintiff James Raynor ("plaintiff" or "Raynor") is an incarcerated individual at Sussex II, which is located in Waverly, Virginia. (Am. Compl. ¶ 7). Plaintiff has been incarcerated as Sussex II since 2005. (Am. Compl. ¶ 20). Plaintiff suffers from several health problems, including seizures, sleep apnea, migraine headaches, and gastrointestinal disorders. (Am. Compl. ¶ 8). As a result of his seizures and gastrointestinal disorders, plaintiff was unable to complete daily life activities without the assistance of a caretaker before January 10, 2013. (Am. Compl. ¶ 14). On January 10, 2013, defendant Pugh was a Housing Unit I Manager at Sussex II and served as plaintiff's housing supervisor. (Am. Comp. ¶¶ 15, 16). Pursuant to his role as a Housing Unit I Manager at Sussex II, Pugh was an employee at VDOC, and at all times relevant, acted under color of state law as an employee of the Commonwealth of Virginia. (Am. Compl. ¶¶ 17, 18).

---

[2] This section details the allegations that are contained in the amended complaint. (Docket no. 76). The undersigned is not making any finding that those allegations are true by reciting those allegations in this section.

In or around November 2012, plaintiff was housed in 1A-Pod, cell 19. (Am. Compl. ¶ 22). Plaintiff's cellmate in this cell assisted plaintiff with his medical conditions. (Am. Compl. ¶ 23). Around November 2012, plaintiff went to MCV hospital for testing related to his gastrointestinal complaints. (Am. Compl. ¶¶ 24, 25). When plaintiff returned to Sussex II, he was reassigned to 1B-Pod, cell 11, which he was to share with inmate K. Mullins ("Mullins"). (Am. Compl. ¶¶ 26, 27). At all times relevant to this complaint, Pugh served as the Housing Unit I Manager for 1B-Pod. (Am. Compl. ¶ 28). Upon reassignment, plaintiff immediately expressed concern regarding his cell assignment to Pugh, as Mullins was unable or unwilling to serve as plaintiff's cellmate caretaker after plaintiff had requested a caretaker to assist him with his medical conditions. (Am. Compl. ¶¶ 29–31). Plaintiff requested, both orally and in writing to Pugh, to be returned to 1A-Pod, cell 19, or in the alternative, to be assigned with other inmates in 1A-Pod, cell 44 or 1B-Pod, cell 21—where the inmates in those cells had volunteered to serve as plaintiff's caretaker. (Am. Compl. ¶¶ 32–35). Pugh denied plaintiff's requests. (Am. Compl. ¶ 36).

On January 10, 2013, plaintiff was still housed in 1B-Pod, cell 11 with Mullins when, on that date, he and Mullins both met with Pugh in 1B-Pod. (Am. Compl. ¶¶ 37, 38). Pugh told Mullins that he was being transferred to another pod. (Am. Compl. ¶ 39). Mullins became angry and informed Pugh that he did not wish to move. (Am. Compl. ¶ 41). Mullins had been housed in 1B-Pod, cell 11 for over two years. (Am. Compl. ¶ 40). Plaintiff informed Pugh that he was the one who wished to move cells and requested that Pugh not force Mullins to move. (Am. Compl. ¶¶ 42, 43). Pugh told Mullins to "go pack" and implied that the move was plaintiff's fault. (Am. Compl. ¶¶ 44, 45). Pugh told plaintiff, "It's not on me, it's on you." (Am. Comp. ¶ 46). Mullins then informed Pugh that if he was forced to move cells, he would physically assault

6

plaintiff. (Am. Compl. ¶¶ 47, 48). Pugh replied, "I don't care," and informed Mullins that he

could go to his new housing assignment or could "go to seg [segregated housing]." (Am. Compl.

¶¶ 49, 50). Mullins then yelled to Pugh, "It's on." (Am. Compl. ¶ 52). Mullins returned to 1B-

Pod, cell 11 and retrieved plaintiff's television from the cell and smashed it on the pod floor.

(Am. Compl. ¶¶ 54, 55). Mullins then retrieved plaintiff's clock radio and smashed it on the pod

floor. (Am. Compl. ¶ 56). Plaintiff expressed that he was upset at the destruction of his property

to Pugh, to which Pugh smirked and shrugged his shoulders. (Am. Compl. ¶¶ 57, 58). Plaintiff

then proceeded back to his cell and Mullins headed towards plaintiff. (Am. Compl. ¶¶ 60, 61).

Mullins said to plaintiff, "We are both going to seg [segregated housing]," and proceeded to

strike plaintiff in the face multiple times. (Am. Compl. ¶¶ 62–64). Plaintiff then fell to the pod

floor, landed on his tailbone, and bounced on the floor. (Am. Compl. ¶¶ 65–67). Pugh observed

the events leading up to the attack, Mullins's destruction of plaintiff's property, and Mullins's

attack of plaintiff. (Am. Compl. ¶¶ 72–74). Pugh laughed as Mullins destroyed plaintiff's

property. (Am. Compl. ¶ 75). Pugh stood at the entrance to 1B-Pod facing into the Pod during

the destruction of plaintiff's property and Mullins's attack of plaintiff and Pugh took no action to

stop Mullins or protect plaintiff. (Am. Compl. ¶¶ 76, 77). Pugh had a radio on his person during

the attack, but did not utilize his radio to call for assistance. (Am. Compl. ¶¶ 79–81).

Plaintiff suffered significant bodily injury from the January 10, 2013 attack by Mullins,

which required immediate medical attention. (Am. Compl. ¶¶ 68, 69).

### B.     The RapidEye Surveillance Video of the January 10, 2013 Assault

In 2003, Sussex II's surveillance cameras were upgraded to a "RapidEye" surveillance

system. (Savino Dep. 6:13–23).[3] The RapidEye surveillance system includes the use of

---

[3] The transcript of the Savino deposition was filed with the court on August 31, 2016. (Docket no. 148-1).

mounted surveillance cameras that are connected to a digital video recorder ("DVR") system, which centrally stores the video captured by the surveillance cameras. (Savino Dep. 12:7–12). The surveillance cameras do not independently record any video. (Savino Dep. 23:2–4). The video stored on the DVR system is maintained for a minimum of 30 days. (Savino Dep. 24:6–12, 25:17–18). Version 7 of the RapidEye surveillance system, as relevant here, had the ability to store video for a maximum of 60 days. (Savino Dep. 25:15–16). The maximum storage length is dependent on, among other factors, the amount of movement captured on the surveillance video. (Savino Dep. 24:6–25:21).

On January 10, 2013, four surveillance video cameras were located in the B-Pod and an additional camera was located in the hallway leading into the B-Pod. (Docket no. 158 at 5). As identified in Mr. Savino's deposition on August 29, 2016, camera 1 faced the back of the pod where plaintiff's cell was located (Savino Dep. 16:19–21); camera 2 captured the center of the pod where plaintiff alleged his belongings were thrown and where he was punched by Mullins (Savino Dep. 16:24–17:3); and camera 4 captured the entrance to the B-Pod and the sally port door (Savino Dep. 17:4–10). Camera 1, 2, and 4 were fixed, stationary cameras. (Savino Dep. 15:6–11). Camera 3 was a pan, tilt, and zoom camera that could be controlled by someone. (Savino Dep. 15:15–16:7). Camera 3 was able to capture the outside of the control booth, the sally port door, and the interview room door but it would not provide a good view of the interview room. (Savino Dep. 18:6–19:9). Camera 5 was a mini dome camera that was stationary and captured the front entry door of the housing unit (Savino Dep. 19:12–25). Cameras 1 through 4 in the pod were connected to one DVR system and camera 5 was connected to a separate DVR system. (Savino Dep. 23:5–9). All five cameras were working on January 10, 2013. (Savino Dep. 20:19–21:9).

Certain employees of VDOC and Sussex II are permitted access to retrieve surveillance video stored on the RapidEye DVR storage system (hereinafter "RapidEye system"). These employees are deemed authorized users of the RapidEye system and are given a user name and password to manage their access to the RapidEye system. (Savino Dep. 26:13–27:11). The RapidEye system had two modes: live and retrieval. (Savino Dep. 26:15–19). The live mode is when an authorized user watches what the surveillance cameras are capturing in real time. (Id.). The retrieval mode is when an authorized user may choose a day and time in the past and view the stored video from that date and time, to the extent it has not been overwritten. (Id.). An authorized user may also save video from the RapidEye system from a particular date and time, and may also select more than one camera from which to view and save video for that particular date and time. (Savino Dep. 27:22–28:9). For example, an authorized user could select a particular date and time on the RapidEye system and also choose to view the video from cameras 1 through 4 in the B-Pod described previously for that date and time. (Id.). Once the authorized user has selected the date and time and the desired cameras, the user may start to play the video captured by those cameras on that date and time. (Id.). After the authorized user has viewed video from a specific date and time period, the authorized user could select "stop" on the RapidEye system and then would be prompted by the RapidEye system to save the clip the authorized user viewed if desired. (Id.). The authorized user could then choose to save the video locally on their computer, a personal "W" drive on VDOC's servers, a CD, a DVD, or an external thumb drive. (Savino Dep. 28:21–29:14). Lieutenant Hayes testified in his deposition that authorized users of the RapidEye system have the ability to both view and save videos from the RapidEye system. (Hayes Dep. 66:13–20).[4] Similarly, Mr. Savino testified that if an

---

[4] The transcript of the Hayes deposition was filed with the court on August 19, 2016. (Docket no. 136-2).

employee at Sussex II was able to review a video from the RapidEye system on their VDOC issued computer, such an employee could be assumed to be an authorized user. (Savino Dep. 27:5–11).

Defendant Pugh is a current authorized user of the RapidEye system. (Docket no. 148-3; Docket no. 157 at 5). In January 2013, Rebecca Owen ("Ms. Owen"), an employee at Sussex II, shared an office with the defendant. (Docket no. 143-7 at 6–7) ("Owen Dep."). Ms. Owen testified in her deposition that either on January 10, 2013 or the next day, Pugh showed her a video from the RapidEye system of the assault on plaintiff. (Docket no. 143 at 6; Owen Dep. 25:11–26:7). Ms. Owen testified that Pugh showed her the video on his computer and that Pugh had access to the RapidEye system when he showed her the video of the January 10, 2013 incident. (Owen Dep. 26:4–19).[5]

The RapidEye surveillance video of the January 10, 2013 incident was also viewed by Lieutenant Hayes, the institutional investigator at Sussex II. (Hayes Dep. 71:4–7). After reviewing the surveillance video of the incident, Lieutenant Hayes downloaded and saved a copy of it to the hard drive of his computer. (Hayes Dep. 74:20–25, 77:16–24). Lieutenant Hayes also copied the video to a CD and provided the CD to the then-warden of Sussex II in 2013. (Hayes Dep. 79:18–80:1). Lieutenant Hayes testified that in 2014 his computer was "refreshed" and the RapidEye video clips that he had saved on his computer, including the one of the January 10, 2013 incident, were lost. (Hayes Dep. 25:11–26:13). The CD given by Lieutenant Hayes to the warden of Sussex II in 2013 has not been found. (Hayes Dep. 80:7–81:7). The video clip downloaded by Lieutenant Hayes from the RapidEye system was the only video that was

---

[5] This testimony and the documentary evidence showing that Pugh is an authorized user (Docket no. 148-3) is inconsistent with the Hayes Affidavit filed with the court stating that only the Warden, Assistant Warden, Chief of Security, and security advisors have access to the RapidEye system. (Hayes Aff. ¶ 9, Docket no. 106-1).

preserved before the video of the January 10, 2013 incident was overwritten by the RapidEye system.

## **Standard of Review**

The court must first consider under what authority the spoliation issue in this matter should be decided.  Plaintiff argues that the recent amendment to Federal Rule of Civil Procedure 37(e) should "not to be applied retroactively" in this case (Docket no. 143 at 2), because it is not "just and practicable to do so" (Transcript of August 12, 2016 hearing, Docket no. 130 at 15:15–16).  Defendant, however, argues that the recent amendment to Rule 37(e) should apply prospectively.  (*Id.* at 26:20–24).  As discussed below, the recent amendment to Rule 37(e) does appear to impose a higher burden on the moving party seeking either an adverse jury instruction or a default judgment than the burden existing under Fourth Circuit precedent in spoliation cases applying the court's inherent power to control the judicial process.

### A.     The Standard for Failure to Preserve ESI under Amended Rule 37(e)

The recent amendments to the Federal Rules of Civil Procedure include significant changes to the standards that govern spoliation issues with regard to electronically stored information ("ESI").[6]  Specifically, Rule 37(e) of the Federal Rules of Civil Procedure, as amended on December 1, 2015, "authorizes and specifies measures a court may employ if" electronically stored information "that should have been preserved is lost, and specifies the findings necessary to justify these measures."  Fed. R. Civ. P. 37 advisory committee's note (2015).  Given that "federal circuits have established significantly different standards for imposing sanctions or curative measures on parties who fail to preserve electronically stored

---

[6] Video surveillance recordings such as those captured by the RapidEye system are considered electronically stored information for Rule 37 purposes. *See Thomas v. Butkiewicus*, No. 3:13-CV-747 (JCH), 2016 WL 1718368, at *7 n.11 (D. Conn. Apr. 29, 2016).

11

information," the amended Rule 37(e) is intended to "foreclose reliance on inherent authority or state law to determine when certain measures should be used." *Id.*

As a threshold matter, amended Rule 37(e) requires a finding that a party had a duty to preserve relevant information when litigation was reasonably foreseeable; the party failed to take reasonable steps to preserve it; and the information cannot be restored or replaced. Fed. R. Civ. P. 37(e). Upon this finding and a showing that prejudice has resulted to another party from loss of that information, the amended rule directs that the court "may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). The amended rule also directs that "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may" the court presume that the lost information was unfavorable to the party, issue a permissive or mandatory adverse jury instruction, or dismiss the action or enter a default judgment. Fed. R. Civ. P. 37(e)(2). Thus, in order to award either the default judgment or adverse inference instruction requested by plaintiff under amended Rule 37(e), plaintiff would need to show that defendant caused the destruction or loss of the surveillance video "with the intent to deprive" plaintiff of the video for use in this litigation.

**B.     The Standard for Spoliation Claims in the Fourth Circuit**

Soon before the amendment to Rule 37(e) became effective,[7] the Fourth Circuit stated that a court may sanction a party for spoliation if the party "(1) had a duty to preserve material evidence, and (2) willfully engaged in conduct resulting in the loss or destruction of that evidence, (3) at a time when the party knew, or should have known, that the evidence was or could be relevant in litigation." *Blue Sky Travel & Tours, LLC v. Al Tayyar*, 606 F. App'x 689,

---

[7] The pre-amendment version of Rule 37(e) provided: "Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system."

697–98 (4th Cir. 2015) (citing *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013)). Prior to the amendment to Rule 37, the authority to issue a sanction for spoliation arose from the court's inherent power to control the judicial process and litigation and is limited to that necessary to redress conduct which abuses the judicial process. *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (citing *Chambers v. Nasco, Inc.*, 501 U.S. 32, 45–46, 115 L. Ed. 2d 27, 111 S. Ct. 2123 (1991)). In previous decisions, the Fourth Circuit has stated the spoliation is not a substantive claim or defense but a "rule of evidence" and is to be "administered at the discretion of the trial court." *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 451 (4th Cir. 2004) (citing *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995)).

In reviewing the various decisions in our circuit involving spoliation issues, it is important to consider the underlying facts of those cases to understand what issues where actually being decided in those decisions. While many cases refer to "negligent loss or destruction of evidence" as not being adequate to support a sanction for spoliation, a close reading of those cases shows that the basis of those decisions was not whether the conduct was negligent. For example, in *Vodusek*, 71 F.3d at 156, the plaintiff argued that her expert did not act in bad faith and therefore an adverse inference instruction was not appropriate. The Fourth Circuit rejected that argument stating the general proposition that "the trial court has broad discretion to permit a jury to draw adverse inferences from a party's failure to present evidence, the loss of evidence, or the destruction of evidence. While a finding of bad faith suffices to permit such an inference, it is not always necessary." *Id.* The court also stated "an adverse inference about a party's consciousness of the weakness of his case, however, cannot be drawn merely from his negligent loss or destruction of evidence; the inference requires a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct

13

resulted in its loss or destruction." *Id.*  Unfortunately, this "negligent loss or destruction of evidence" portion of the *Vodusek* decision has been cited numerous times for the proposition that negligent conduct cannot support a finding of spoliation[8] even though more direct decisions from the Fourth Circuit recognize that *any level of fault* can support a finding of spoliation.

A closer reading of Fourth Circuit and Eastern District of Virginia decisions reveals that the issue of the level of fault is to be considered in determining the appropriate sanction, if any, for failing to preserve or destroying relevant materials once a duty has been established and not in making a determination whether a spoliation claim is valid.  In *Silvestri* the Fourth Circuit stated that "a court must find some degree of fault to impose sanctions" and that the trial court has "broad discretion" in choosing the appropriate sanction "to serve the prophylactic, punitive, and remedial rationale underlying the spoliation doctrine." *Silvestri*, 271 F.3d at 590.  In that case the court affirmed the trial court's dismissal of the case recognizing the "conduct of the spoliator may have been either deliberate or negligent" but the prejudice to the defendant was "highly prejudicial." *Id.* at 593.  In *Cole v. Keller Indus., Inc.*, 132 F.3d 1044, 1047 (4th Cir. 1998), the Fourth Circuit found that the trial court's decision to exclude evidence and granting judgment was excessive given that the plaintiff did not intentionally destroy evidence but stated that because the plaintiff, in fact, destroyed evidence, however innocently, a jury instruction permitting an adverse inference to be drawn might have been appropriate.

This court has recognized that "[i]n the Fourth Circuit, any level of fault, whether it is bad faith, willfulness, gross negligence, or ordinary negligence, suffices to support a finding of

---

[8] For example in *Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013) the court cited *Vodusek* for the proposition that "spoliation does not result merely from the negligent loss or destruction of evidence" but found that the plaintiff had failed to establish that the defendant had a duty to preserve the audio recordings.  In *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 450–2 (4th Cir. 2004), the court also quoted the "negligent loss or destruction of evidence" statement in *Vodusek* but found the defendant never possessed the information that was allegedly lost and therefore did not warrant a finding of spoliation.

spoliation." *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 497 (E.D. Va. 2011) (citing *Victor Stanley, Inc. v. Creative Pipe, Inc.* 269 F.R.D. 497, 529 (D. Md. 2010)). "Spoliation can occur when the destruction of evidence in anticipation of litigation is willful. However, it can also occur when the destruction is the result of inadvertent, albeit negligent, conduct." *Samsung Elecs. Co. v. Rambus, Inc.*, 439 F. Supp. 2d 424, 540 (E.D. Va. 2006), *vacated on other grounds*, 523 F.3d 1373 (Fed. Cir. 2008).

C.     **The Effective Date of the Amendment to Rule 37 and Governing Provisions**

Before the amended rules became effective on December 1, 2015, Chief Justice John G. Roberts transmitted the proposed amendments to Congress on April 29, 2015 and included an order directing in part that "the foregoing amendments to the Federal Rules of Civil Procedure shall take effect on December 1, 2015, and shall govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending." 2015 U.S. Order 0017. The Chief Justice's order is consistent with the relevant statutory provision, which provides:

> [T]he Supreme Court shall not require the application of [new rules] to . . . proceedings then pending to the extent that, in the opinion of the court in which such proceedings are pending, the application of such rule in such proceedings would not be feasible or would work injustice, in which event the former rule applies.

28 U.S.C. § 2074(a). Because this matter was filed before the amended Rule 37(e) became effective on December 1, 2015, the court must consider whether the application of the new Rule 37(e) is appropriate or whether, instead, the prior Fourth Circuit standard should apply.

The amended rule creates no greater obligation on a party to preserve electronically stored information. Indeed, "Rule 37(e) is based on [the] common-law duty" of potential litigants to "preserve relevant information when litigation is reasonable foreseeable." Fed. R.

Civ. P. 37 advisory committee's note (2015). This duty is no different than the Fourth Circuit's prior holdings regarding the duty of potential litigants to preserve relevant information when litigation is reasonable foreseeable. *See, e.g.*, *Silvestri*, 271 F.3d at 591 ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.").

As discussed above, the Fourth Circuit's spoliation analysis is arguably less rigorous than that required by the amended Rule 37(e) since the amended version now requires that a court find that a party acted "with the intent to deprive another party of the information's use in the litigation" in order to find that an adverse jury instruction or default judgment is appropriate. Such a finding is tantamount to a finding of bad faith spoliation. *See Accurso v. Infra-Red Servs., Inc.*, No. 13-7509, 2016 WL 930686, at *3 (E.D. Pa. Mar. 11, 2016) (indicating that the new Rule 37(e) "does not appear to have substantially altered the moving party's burden" in the Third Circuit "of showing that ESI was destroyed in 'bad faith' when requesting an adverse inference."), *Marshall v. Dentfirst, P.C.*, 313 F.R.D. 691, 695, 699 (M.D. Ga. 2016) (indicating that the amended Rule 37 is "substantially similar" to Eleventh Circuit case law requiring that the non-moving party "acted in bad faith").

Under the circumstances in this case, the court finds that applying such a heightened evidentiary showing on the plaintiff in this matter would be unjust. This action was filed more than two years before the amendment to Rule 37(e) took place. (*See* Compl. docketed on September 4, 2013). From September 4, 2013 through the date his complaint was dismissed by the District Judge on November 7, 2014, the plaintiff was proceeding *pro se*. Thereafter, until plaintiff was appointed counsel by the Fourth Circuit for the purposes of his appeal on June 25,

16

2015 (Docket no. 61), plaintiff continued to represent himself without the aid of counsel. For the purposes of proceeding before the District Court upon remand from the Fourth Circuit, plaintiff has been represented by counsel. If plaintiff had been represented by counsel from the beginning of this action, it is quite likely that the spoliation issue now before the court would have been raised and resolved long before the amended Rule 37(e) went into effect. Additionally, the allegations in the complaint and the alleged actions and inaction concerning plaintiff's motion for sanctions took place long before the amendment to Rule 37(e) went into effect. Under these circumstances, the court finds that it would be unjust to apply the heightened evidentiary burden of the amended Rule 37(e) in this case. *See Thomas v. Butkiewicus*, No. 3:13-CV-747 (JCH), 2016 WL 1718368, at *9 (D. Conn. Apr. 29, 2016) (finding it unjust to utilize the new standard of Rule 37(e) to a motion for sanctions where "all of the actions and inaction relevant to the resolution of the" motion for sanctions "transpired before the revisions to Rule 37(e) went into effect").[9]

For these reasons, the court concludes that it would be unjust to utilize the amended version of Rule 37(e) in this matter. Accordingly, the court will apply the traditional Fourth Circuit standard that was applicable prior to December 1, 2015 in assessing plaintiff's motion.

## Analysis

As discussed previously, "[s]poliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or

---

[9] The court is aware that several courts have found that it is appropriate to apply the amended version of Rule 37(e) to disputes arising in cases filed prior to the effective date of the amendment on the basis that the amended Rule does not does not apply a new duty to preserve. See, *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 496 (S.D. N.Y. 2016); *Brown Jordan International, Inc. v. Carmicle*, No. 0:14-CV-61415 (RLR), 2016 WL 815827, at *34–35 (S.D. Fl. March 2, 2016); *Marshall v. Dentfirst, P.C.*, 313 F.R.D. 691, 694–95 (M.D. Ga. 2016). From a close reading of those cases, it appears that the courts in those cases recognized that the result would have been the same in their circuits even if the earlier version of Rule 37 was applied.

reasonably foreseeable litigation." *Silvestri*, 271 F.3d at 590. A court may sanction a party for spoliation if the party "(1) had a duty to preserve material evidence, and (2) willfully engaged in conduct resulting in the loss or destruction of that evidence, (3) at a time when the party knew, or should have known, that the evidence was or could be relevant in litigation." *Blue Sky Travel & Tours, LLC*, 606 F. App'x at 697–98 (citing *Turner*, 736 F.3d at 282). The movant bears the burden of showing these elements and, while it appears the Fourth Circuit has not addressed the precise burden of proof to be applied in a motion for sanctions, there is significant authority to support a burden of proof by clear and convincing evidence, especially if considering a motion for default judgment. *Suntrust Mortgage, Inc. v. AIG United Guar. Corp.*, No. 3:09CV529, 2011 WL 1225989, at *20 (E.D. Va. Mar. 29, 2011), *aff'd sub nom. Suntrust Mortgage, Inc. v. United Guar. Residential Ins. Co. of N. Carolina*, 508 F. App'x 243 (4th Cir. 2013); *Glynn v. EDO Corp.*, No. 07-01660, 2010 WL 3294347, at *2 (D. Md. Aug. 20, 2010); *Samsung Elecs. Co.*, 440 F. Supp. 2d 495, 497 (stating that in a previous case, the court ruled that Infineon had proven, by clear and convincing evidence, that Rambus had spoliated evidence, for which dismissal was the appropriate sanction). The resolution of that issue is not necessary in this case since the outcome of this motion would be the same whether a preponderance standard or a clear and convincing standard is applied.

A.    **Obligation to Preserve Material Evidence**

Plaintiff contends that "Pugh and other prison officials were aware of both a reasonable likelihood of litigation regarding the attack against Raynor and the relevance of the surveillance video record" soon after the alleged attack. (Docket no. 97 at 9). Plaintiff argues this is so because on January 19, 2013—nine days after the alleged assault—plaintiff submitted a written complaint that identified his claim that Pugh "did willfully put [his] life in danger by telling

18

[him] to go back in [his] cell" with the knowledge that Mullins had told Pugh that it would be "on" if Pugh made Mullins change cells. (Docket no. 97 at 9) (*see also* Docket no. 97-1 at 46) (January 19, 2013 Informal Complaint). In this informal complaint, Raynor also stated that "proof is on [the] video tape." (Docket no. 97-1 at 46). The informal complaint was reviewed by Pugh and signed by him on January 23, 2013. (*Id.*). In his regular grievance stamped received by the Sussex II grievance officer on February 8, 2013, Raynor again identified the nature of his complaint against Pugh, identified that the "video tape can prove" his allegations, requested that they "hold the video tape of 1-10-13 as evidence!," and indicated that he was represented by counsel. (Docket no. 97-1 at 49). Plaintiff also argues that even if Pugh did not have any official responsibility to save surveillance video on account of his role as a housing manager at Sussex II, he can be held liable for the failure of other prison officials to preserve the surveillance video of the incident. (Docket no. 109 at 3).

Defendant argues that he did not have a duty to preserve the surveillance video at issue because he did not anticipate litigation related to the alleged assault on plaintiff, and second, he was "not permitted to access the video surveillance system in order to retrieve and save video footage." (Docket no. 106 at 7, 8). Defendant claims that because the video was never in his "custody or control" and since he "lacked the authority to instruct" other prison officials "to permanently preserve the video footage," he lacked an obligation to preserve the surveillance video in this case. (Docket no. 106 at 8). After evidence was uncovered showing that Pugh did in fact have access to the surveillance video on his VDOC computer, that he actually reviewed the video of the incident, and that he could have saved it, he argues that he has never been trained on how to save video clips and such tasks had been delegated to other VDOC employees at Sussex II. (Docket no. 157 at 6).

19

In order to "[t]o make a finding of spoliation, the court must be satisfied that the party

alleged to have spoliated evidence had a 'duty to preserve' relevant evidence, which the party

then 'breach[ed] . . . through the destruction or alteration of the evidence.'" *E.I. du Pont de*

*Nemours & Co.*, 803 F. Supp. 2d 469, 496 (quoting *Victor Stanley, Inc.*, 269 F.R.D. at 521)).

Here, the plaintiff must show that the defendant "had a duty to preserve documents or materials

that may be relevant to the litigation or pending litigation." *Id.* This duty does not require a

party to preserve "every shred of paper, every email or electronic document, and every back up

tape," *E.I. du Pont de Nemours & Co*, 803 F. Supp. 2d at 496 (quoting *Zubulake v. UBS*

*Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003)). Instead, the duty requires a party to

"identify, locate, and maintain, information that is relevant to specific, predictable, and

identifiable litigation." *Victor Stanley, Inc.*, 269 F.R.D. at 522 (internal quotation marks and

citation omitted). Finally, litigation need not be imminent nor need it be probable for a party to

anticipate, or reasonably anticipate, litigation. *See Samsung Elecs. Co.*, 439 F. Supp. 2d at 543.

Defendant's argument that he did not have an opportunity or a duty to preserve material

evidence in this matter is unsupported by the evidence before the court. As described previously,

on August 29, 2016, Mr. Savino, the electronic security manager at the VDOC, testified that on

January 10, 2013, the day of the alleged incident, all of the cameras that would capture the

actions before, during, and after the alleged assault on plaintiff were operational. (Savino Dep.

21:2–9). Each of these cameras would capture video, which was then recorded onto the

RapidEye system and stored for a minimum of 30 days and a maximum of 60 days, after which,

the video was recorded over and replaced with new surveillance video. (Savino Dep. 24:6–14).

Mr. Savino indicated that if a video was still stored on the RapidEye system, an authorized user

of the RapidEye system "could go back to the time that [the user] wanted to see and then start

20

playing it back and stor[e] a clip for the time period that [the user] wanted[ed] to watch."

(Savino Dep. 26:8–12). Mr. Savino further indicated that if an employee at Sussex II was able to

review a video in RapidEye from their computer issued by VDOC, this would be sufficient to

conclude that this employee was an "authorized user" of the RapidEye system. (Savino Dep.

27:5–9). Lieutenant Hayes has also testified that a VDOC employee with access to the RapidEye

system has the same capabilities and functions within the RapidEye system, that is, every

authorized user can watch clips and save clips. (Hayes Dep. 66:13–20). Mr. Savino indicated

that such an authorized user could go into "retrieval mode" on the RapidEye system and could

view and store a clip, for example, locally on their computer, on a folder stored on VDOC's

server, on a CD, on a DVD, or on an external, portable storage drive. (Savino Dep. 27:22–28:9,

29:6–9).

Here, the defendant is a current authorized user of the RapidEye system at Sussex II.

(Docket nos. 148, 148-3). As described previously, Ms. Owen, a Sussex II employee, testified in

her August 9, 2016 deposition that the defendant showed her the surveillance video of the

alleged assault either on the day of the alleged assault or the next day. (Docket nos. 143 at 12;

143-7, Owen Dep. 25:11–26:25). Ms. Owen testified that the defendant showed her the video on

his VDOC-issued computer and that the defendant had access to the RapidEye system on that

computer. (Owen Dep. 26:4–19). Ms. Owen is not an authorized user of the RapidEye system.

(Owen Dep. 26:20–22).

Ms. Owen's testimony contradicts defendant's sworn interrogatory answers in this

matter, which indicate that he "do[es] not know whether any security camera recorded the

incident," (Docket no. 97-1 at 57), and his denial of a request for admission that he "[a]dmit that

[he] reviewed surveillance footage from January 10, 2013," (*Id.* at 41). That Ms. Owen recalls

21

watching the surveillance video of the alleged assault of plaintiff on defendant's computer in

January 2013, recalls the names of plaintiff and Mr. Mullins, and importantly, recalls why she

watched the video after the incident and not "at the time of the incident[—]because they got Mr.

Mullins packed and moved out, and Mr. Raynor to wherever they needed to take him" (Owen

Dep. 25:17–20)—is highly persuasive evidence that defendant Pugh had access to the RapidEye

system on his computer on January 10, 2013. Based on his ability to review and access the

RapidEye surveillance footage of January 10, 2013, Mr. Savino's testimony indicates that

defendant was an authorized user of the RapidEye surveillance system when he reviewed the

surveillance video on January 10 or 11, 2013. (*See* Savino Dep. 26:20–27:9). Accordingly, as

an authorized user, Mr. Savino's testimony makes clear that defendant also would have had the

ability to save and preserve a copy of the video that he viewed with Ms. Owen before the

RapidEye video of the incident was overwritten. (*See* Savino Dep. 28:21–29:3). This

conclusion is also supported by Lieutenant Hayes's testimony that all authorized users have the

same abilities in the RapidEye system, so for example, an authorized user who could view videos

would also be able to save them. (*See* Hayes Dep. 66:13–20). Defendant has admitted in his

discovery responses that the RapidEye surveillance cameras at Sussex II were "in a position to

capture video footage of Defendant's meeting with Inmate Mullins and Plaintiff"; the

"destruction of Plaintiff's property"; "Inmate Mullins'[s] physical attack on Plaintiff";

"Defendant's location and movements at the time of [the] destruction of Plaintiff's property";

and "Defendant's location and movements at the time of Inmate Mullins'[s] physical attack on

Plaintiff." (Docket no. 97-1 at 40–41). For these reasons, the court finds that plaintiff has shown

by clear and convincing evidence that defendant Pugh had the ability to retrieve and preserve the

RapidEye surveillance video that captured the events before, during, and after the alleged assault of plaintiff before it was overwritten by the RapidEye system.

In addition to Pugh, the plaintiff has shown by clear and convincing evidence that Pugh's employer (the VDOC, and in particular Lieutenant Hayes) had the ability to retrieve and preserve the RapidEye surveillance video that captured the events before, during, and after the alleged assault of plaintiff. In fact, Lieutenant Hayes has admitted that as a part of his job duties and responsibilities as the Institutional Investigator at Sussex II, he did review surveillance video of the incident, he saved at least one portion of the video of the incident, and that he forwarded a copy of that video footage to the warden at Sussex II. (Hayes Aff. ¶ 5).

The court next finds that defendant Pugh and the VDOC reasonably should have known as early as January 23, 2013 that the RapidEye surveillance video that showed the events before, during, and after the alleged assault of plaintiff may be relevant to anticipated litigation. On January 23, 2013, defendant responded to and signed the informal complaint filed by plaintiff, which alleged that defendant Pugh "willfully put [his] life in danger by telling [him] to go back in" his cell with Mullins after Mullins had threatened to harm plaintiff if Pugh did so. (*See* Docket no. 97-1 at 46). In that informal complaint, plaintiff also stated that "proof is on video tape." (*Id.*). Defendant responded to plaintiff's complaint by indicating that "[w]e were acting upon your request for cell change" and signed the form on January 23, 2013—thirteen days after the alleged assault. (*Id.*). This time period was well within the 30 day period before the RapidEye video was to be overwritten by the RapidEye system. In addition, the Regular Grievance form filed by the plaintiff was received by the Grievance Office at Sussex II on February 8, 2013 (also within 30 days of the incident) indicating that the video could prove

plaintiff's allegations and plaintiff specifically requested that the video tape be held as evidence at the request of his attorney. (*See* Docket no. 97-1 at 49).

Defendant's signature and response to plaintiff's informal complaint shows that he read the informal complaint and was aware that plaintiff's allegations specifically identified his actions and inaction as a cause of the alleged assault on plaintiff. There also is no doubt that defendant was aware that plaintiff identified the video tape of the incident as relevant evidence regarding his complaint ("proof is on video tape"). Indeed, the evidence establishes that defendant actually retrieved and reviewed the surveillance video soon after the incident took place.

Moreover, the assault on plaintiff in plain view of the defendant was not an ordinary event in Sussex II and defendant testified that this was the only time that he has personally witnessed an inmate punch another inmate in the housing unit. (Docket no. 143-1, Pugh Dep. 93:5–19). Defendant further testified that other than this one incident that he personally witnessed, he has only responded after-the-fact to "about two" other incidents of inmates fighting in the housing unit. (Pugh Dep. 93:12–94:4). Thus, there is little support for defendant's claims (Docket no. 106 at 7), that the events of January 10, 2013 and plaintiff's allegations regarding defendant's inaction regarding that incident were a common occurrence at Sussex II and that since "prisoners file grievances all of the time about all types of situations" it would impose an undue burden and be impractical to preserve video evidence. While it may be accurate that many grievances are filed relating to seemingly trivial matters at Sussex II, in this case defendant actually witnessed an assault on the plaintiff and the destruction of plaintiff's property and the defendant knew that the plaintiff was claiming that he "willfully put my life in danger." Indeed, the institutional investigator at Sussex II, Lieutenant Hayes, did actually review the RapidEye

24

video of the January 10, 2013 incident, downloaded a copy to his computer, and provided a copy

of the video on a CD to the then-warden of Sussex II. (Hayes Aff. ¶ 5). The actions by

Lieutenant Hayes clearly show that the January 10, 2013 incident was not an insignificant event

and that the burden to preserve the video of the incident was not undue or impractical. *See*

*Thomas*, 2016 WL 1718368 at *10 ("the DOC appears to have had actual knowledge that the

September 18, 2012 incident was serious and that the video of the recreation period should be

preserved, because a DOC employee did, in fact, download and save a portion of the surveillance

footage of the incident."). The regular grievance form received by the grievance office at Sussex

II on February 8, 2013 also puts the VDOC on notice of the serious nature of plaintiff's claim

and the need to preserve the video tape. (Docket no. 97-1 at 49). In that written grievance

plaintiff states that the defendant willfully put his life in danger with malice intent and that the

video tape can prove it. (*Id.*). Plaintiff specifically stated in that form that the video tape can

prove his claims and he requested that it be held as evidence at the request of his attorney. (*Id.*).

Accordingly, it would hardly impose the burden defendant suggests to find that he had a

duty to preserve the RapidEye surveillance video in this matter—a video that defendant indicates

was of a rare event, that he had access to through the RapidEye system on his computer, that he

viewed with a colleague, that he was made aware of an informal complaint that identified his

inaction as the cause of the complainant's injuries, and that was saved by the Sussex II

institutional investigator and shared by the investigator with the Sussex II warden.[10]

---

[10] Plaintiff also argues that defendant Pugh and other prison officials were under both a statutory and
regulatory duty to preserve the RapidEye surveillance video at issue in this matter. (Docket no. 118). Because the
court has found that defendant Pugh was under a common-law duty to preserve the RapidEye surveillance video, the
court need not reach the question of whether Pugh and the VDOC was also under a statutory or regulatory duty to
preserve the video in this matter, and accordingly, does not address the applicability or scope of Virginia Public
Records Act, Va. Code. § 42.1-76 *et seq.* and the Records Retention and Disposition Schedule, Specific Schedule
No. 701-100 (Docket no. 118-3) to this matter. The court notes, however, that a statutory or administrative
regulation "does not necessarily mean that [a party] had such a duty with respect to [current] litigation, and the fact

For the above reasons, the court finds that defendant and the VDOC knew, or should have known, that the RapidEye surveillance video of the January 10, 2013 incident was relevant to reasonably foreseeable litigation, and accordingly, they had a duty to preserve this evidence.

**B.      Conduct Resulting in the Loss or Destruction of Evidence**

Plaintiff argues that Pugh's failure to make any effort to preserve the RapidEye surveillance video in this matter, when it was identified by plaintiff in his informal complaint, shows his willfulness and intent to deprive plaintiff of the use of that evidence in this action. (Docket no. 97 at 17).   Plaintiff also argues that the Virginia Public Records Act, Virginia Code § 42.1-76 *et seq.* and the Records Retention and Disposition Schedule, Specific Schedule No. 701-100 required defendant and the VDOC to retain video recordings of incidents like that of January 10, 2013 for five years (Docket no. 118 at 2), and the "ignor[ing]" of such statutory and regulatory requirements constitutes bad faith intent to deprive plaintiff of the ability to use the video in this litigation (Docket no. 158 at 7).

Defendant argues that, even if he had access to the RapidEye surveillance video, there has been no evidence or testimony that he "has ever saved a video clip, nor is there any evidence or testimony indicating that" he "knows how to save a video clip." (Docket no. 157 at 5–6). Defendant argues that he has not been trained how to save video clips and merely because he is authorized to access the RapidEye system today, and might have been in 2013, "does not necessarily mean that" he "possesses the practical knowledge to actually save and retain RapidEye video, much less that he had that knowledge in January 2013." (Docket no. 157 at 6). Defendant also argues that the task of retrieving and saving video clips in response to staff or

---

that [a] party failed to observe some other preservation obligation does not itself prove that [the party's] efforts to preserve were not reasonable with respect to a particular case." Fed. R. Civ. P. 37 advisory committee's note (2015).

26

offender requests is the responsibility of Lieutenant Hayes, and because this task has been delegated to Lieutenant Hayes, defendant cannot be expected to save video clips or know how to do so. (*Id.*). For these reasons, defendant argues that he did not intentionally or willfully engage in conduct resulting in the loss or destruction of the surveillance video. (Docket nos. 106 at 9, 157 at 6).

As noted above, a finding of spoliation can be based on any level of fault, including bad faith, willfulness, gross negligence, or ordinary negligence. The evidence presented establishes that the defendant had access to the video of the incident and the ability to preserve that video prior to it being overwritten but defendant failed to take any steps to preserve it. By no later than January 23, 2013 (the date the informal complaint was signed by defendant), defendant knew that plaintiff was claiming that he willfully placed plaintiff's life in danger, that he did nothing, and that the "proof is on video tape". (Docket no. 97-1 at 46). The testimony of Ms. Owen establishes that defendant had access to the video of the January 10, 2013 incident from his VDOC computer. (Owen Dep. 25:11–26:25). Mr. Savino testified that a person with access to the RapidEye surveillance video could not only view but could also save that video on his or her computer and the person would be prompted to save the video after reviewing it. (Savino Dep. 27:22–29:14). Even though defendant was aware of the serious claims being made against him and the potential relevance of the video of the incident prior to the time in which the video would have been overwritten, he took no steps whatsoever to preserve it.[11] While he argues that it was not his responsibility to preserve video evidence, he did not take any steps to see that anyone else within the VDOC would preserve that evidence. These facts establish by clear and convincing

---

[11] The law is clear that a routine document destruction policy does not alleviate the duty to preserve relevant documents. See *E.I. du Pont*, 803 F. Supp. 2d at 496; *Zubulake v. UBS Warbug, LLC*, 220 F.R.D. 212, 218 (S.D. N.Y. 2003).

evidence that defendant's conduct in failing to take any steps, much less reasonable steps, to preserve relevant information resulted in the loss of relevant evidence.

In addition to the defendant, it is also clear that Lieutenant Hayes failed to take reasonable steps to preserve the video evidence of the incident. While Lieutenant Hayes did in fact save a portion of the video of the incident on his VDOC computer, he failed to take adequate steps to preserve that evidence. Lieutenant Hayes testified on August 9, 2016, that he had his VDOC computer since 2006 and that Northrup Grumman would refresh his computer periodically. (Hayes Dep. 21:8–13). He then testified that he lost his RapidEye clips that were saved on the hard drive of his computer (including the video clip of the January 10, 2013 incident) when a refresh was done in 2014. (Hayes Dep. 25:11–26:13). He stated that prior to the 2014 refresh he did not experience losing data as the result of a refresh. (Hayes Dep. 28:8–25). Lieutenant Hayes stated that when the video clips were lost during the refresh in 2014 he did not know they were going to be lost and if he had known, he "would have saved them to a disk" and he "would still have them." (Hayes Dep 115:11–23).

After Lieutenant Hayes was deposed, plaintiff deposed Mr. Savino on August 29, 2016. (Docket no. 148-1). Mr. Savino's testimony and the emails between him and Lieutenant Hayes (Docket no. 148-2) tell a different story. On November 22, 2011, Lieutenant Hayes sent Mr. Savino an email stating that several RapidEye video clips that were saved to his computer were lost when his computer was upgraded. (Docket no. 148-2). Mr. Savino testified that Lieutenant Hayes contacted him in 2011 about losing RapidEye video clips during a refresh but he was not contacted about the loss of any video clips in 2014. (Savino Dep. 60:12–61:15). Given the documented history that Lieutenant Hayes had in 2011 with the loss of his RapidEye video clips during a refresh and his testimony that "he would save them to a disk" to avoid having them lost

28

before a refresh, it is clear that he did not take reasonable steps to preserve the video evidence in this case when a refresh of his computer was performed in 2014 and he failed to "save them to a disk."

While the court believes that the plaintiff has failed to show that the defendant and Lieutenant Hayes acted with the specific "intent to deprive" plaintiff of this video evidence or acted in bad faith, it is clear that their conduct did result in relevant evidence not being available for use at trial. As the Sussex II employee who responded to plaintiff's informal complaint, which identified the RapidEye surveillance video as relevant evidence and identified serious claims against defendant, defendant had a duty to ensure that efforts were made to preserve the RapidEye surveillance video. However, as previously discussed, defendant has testified that he believed that "computer techs" had control over the RapidEye videos at Sussex II, and accordingly, he did nothing to preserve the video. When asked who the "computer techs" at Sussex II were at the time of the incident on January 10, 2013, defendant indicated that he did not know. (Pugh Dep. 52:24–53:2). Defendant's failure to take any action to preserve the RapidEye surveillance video and his reliance on unknown "computer techs" to preserve the evidence was unreasonable. (Docket no. 157-1).

Likewise, while the actions of Lieutenant Hayes may not have been with the "intent to deprive" or in bad faith, it is clear that his failure to properly back-up the copy of the RapidEye video of the January 10, 2013 incident resulted in relevant information being destroyed. In 2014 Lieutenant Hayes knew there was a real risk that a computer refresh would result in the loss of his RapidEye video clips but he failed to take the action that he testified was appropriate, that is "save them to a disk." As a result of his failure to take that precaution, relevant information was lost and has not been recovered. Lieutenant Hayes's failure to guard against such a loss,

29

considering he had previously lost clips in a computer refresh in 2011 (Docket no. 148-2), was at least grossly negligent if not reckless.[12]

### C.   Relevance of the Evidence Destroyed

Plaintiff contends that the RapidEye surveillance video "contained evidence that was directly relevant to [his] allegations [in his prisoner complaints], and to any subsequent litigation based on those allegations" because the "video footage contained a record of the very events that formed the basis of [his] claims." (Docket no. 97 at 11). Defendant argues that the video footage would not have necessarily depicted the defendant's movements in the pod area at the time of the altercation, and for that reason, "[t]he absence of the video . . . is unlikely to prejudice the Plaintiff in his ability to present his case." (Docket no. 106 at 11).

The final element that a plaintiff must show in order for a court to conclude that the imposition of sanctions for spoliation is appropriate is that the spoliation of evidence occurred "at a time when the party knew, or should have known, that the evidence was or could be relevant in litigation." *Blue Sky Travel & Tours, LLC*, 606 F. App'x at 698. "In the context of spoliation, lost or destroyed evidence is relevant if a reasonable trier of fact could conclude that the lost evidence would have supported the claims or defenses of the party that sought it." *Victor Stanley, Inc.*, 269 F.R.D. at 531. A finding of relevance for the purposes of an analysis for determining spoliation sanctions requires both a finding of relevance and some degree of prejudice to the moving party. *Id.* at 532. As such, after a moving party shows that evidence is relevant to an action, the court must then make a determination that the "spoliated matter was likely to have been favorable to [the movant's] case. That can be done by establishing that the

---

[12] While the VDOC is not officially a party to this action, in circumstances such as this, it is appropriate to require a Department of Corrections to preserve evidence related to a potential case against its employees when it is aware that litigation is reasonably likely. *See Pettit v. Smith*, 45 F. Supp. 2d 1099, 1106 (D. Ariz. 2014).

spoliated material addressed topics, or falls into categories of documents, that would be favorable to the movant's case." *E.I. du Pont de Nemours & Co.*, 803 F. Supp. 2d at 498.

Lieutenant Hayes's deposition testimony makes clear that the RapidEye surveillance video of the January 10, 2013 incident was relevant in this matter and it would have supported, at least in part, plaintiff's case. Lieutenant Hayes's testified that he viewed the video and he recalls it showing: the defendant speaking with the plaintiff and Mr. Mullins separately in the interview room, the plaintiff being the first to speak with the defendant; Mr. Mullins's assault of plaintiff; and Mr. Mullins "roll[ing] [plaintiff's] property out into the pod." (Hayes Dep. 72:5–25). In the amended complaint in this action, plaintiff has alleged that the defendant met with the plaintiff and Mullins in the 1B-Pod. (Am. Compl. ¶ 38). Plaintiff has also alleged that after Mullins and plaintiff spoke with the defendant, Mullins proceeded to destroy plaintiff's property. (Am. Compl. ¶¶ 55, 56). Plaintiff has also alleged that Mullins assaulted him in the pod after destroying his property, causing him to fall to the pod floor. (Am. Compl. ¶ 65). Lieutenant Hayes's testimony shows that the RapidEye surveillance video would likely have supported plaintiff's assertions that he and Mullins had a discussion with the defendant on January 10, 2013, Mr. Mullins destroyed plaintiff's property after the discussion, and Mr. Mullins assaulted plaintiff. These allegations are certainly relevant to plaintiff's claims.

However, in considering the overall significance of the video tape to plaintiff's case it is clear that there was no audio recording of the incident so the loss of this evidence does not have any impact on plaintiff's ability to present evidence of who said what during the incident. Furthermore, it is unclear if the video would have been able to confirm the specific location of the defendant and his movements during the assault. Plaintiff claims the defendant was standing at the interior door in the pod during the incident (Docket nos. 97-46, 97-49) and defendant states

in his answer to interrogatory 4 that at the time of the incident he "was in the sally port area of Housing Unit 1B, which is outside of B-1 Pod" (Docket no. 97-54). In any event, it is likely that the video would have been able to establish whether the defendant was in the pod or not in the pod at the time of the incident since it would have recorded his movements while in the pod area. Accordingly, the court finds that the RapidEye surveillance video of the January 10, 2013 incident was relevant in this action and that plaintiff has suffered some degree of prejudice by the failure to preserve that evidence.

### D.  Sanctions

The court has found that defendant Pugh and the VDOT through Lieutenant Hayes breached a duty to preserve the RapidEye surveillance video of the January 10, 2013 incident at issue in this motion. However, the plaintiff has not established that defendant Pugh or Lieutenant Hayes acted in bad faith or with the intent to deprive. Accordingly, the undersigned finds that the sanction of a default judgment requested by the plaintiff is not appropriate. As discussed in *Silvestri,* before imposing the "harsh sanction of dismissal" for even negligent spoliation of evidence, a court must consider both the spoliator's conduct and the prejudice caused and be able to conclude either (1) that the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, or (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim. *Silvestri*, 271 F.3d at 593. Having reviewed the entire record in this matter, the undersigned finds that the defendant's actions were not so "egregious" as to amount to a forfeiture of defendant's defenses in this matter, nor is the loss of the RapidEye surveillance video so prejudicial to the plaintiff that he is unable to prove his case without it.

32

While a sanction of a default judgment is not warranted in this case, the court does find that a sanction is necessary to cure the prejudice caused to the plaintiff by the loss of the video tape by the defendant and the VDOC. Courts have broad discretion in determining an appropriate sanction and the "applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *Silvestri*, 271 F.3d at 590. The sanction should attempt to level the evidentiary playing field and sanction the improper conduct. *Vodusek*, 71 F.3d at 156. Given that the video did not have any audio recording and that the defendant has admitted that he did witness the assault, the video is of somewhat limited probative value. Nevertheless, the video would have confirmed whether the defendant was in the pod during the entire incident and possibly whether the defendant witnessed the destruction of plaintiff's property prior to assault, which he appears to deny in part. (Docket no. 97-1 at 38). Even though this issue will ultimately need to be decided by the trial judge after hearing all the evidence presented at trial, given the record presented on this motion the undersigned finds that an instruction to the jury that it may infer that the surveillance video would have been favorable to the plaintiff is justified. An adverse inference instruction that would permit, but not require, the jury to presume that the surveillance video would have corroborated plaintiff's version of where the defendant was located and his lack of any action during the incident on January 10, 2013 would serve the purpose of leveling the evidentiary playing field.

For the reasons stated above, the undersigned finds that the relief requested in plaintiff's Motion for Sanctions Due to Spoliation of Evidence, namely a default judgment or a mandatory adverse jury instruction, is unwarranted based on the evidence before the court. However, the undersigned finds, that subject to reconsideration by the trial judge given the evidence presented at trial, that in order to remedy defendant's failure to preserve the RapidEye surveillance video of

33

the January 10, 2013 incident, that it would be appropriate for the jury to be instructed that they may presume that the surveillance video would have been supportive of plaintiff's version of the events on January 10, 2013.  For the foregoing reasons, it is hereby

ORDERED that plaintiff's Motion for Sanctions Due to Spoliation of Evidence is granted in part, to the extent that plaintiff be permitted to present argument to the trial judge at an appropriate time that a permissive adverse jury instruction be given to the jury concerning the loss of the surveillance video.

Entered this 21st day of October, 2016.

/s/
John F. Anderson
United States Magistrate Judge
John F. Anderson
United States Magistrate Judge